CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED

December 16, 2025
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the COMMONWEALTH OF VIRGINIA, <u>ex rel.</u>, EDWARD BRESLOW, | ) ) ) ) | |
| Plaintiff-Relator, | ) | Case No. 7:19-cv-839 |
| | ) | |
| v. | ) | |
| | ) | |
| JP PHARMA, LLC d/b/a KARE PHARMACY AND COMPOUNDING and JAY SUTHAR, | ) ) ) | By: Michael F. Urbanski Senior United States District Judge |
| Defendants. | ) | |

### <u>MEMORANDUM OPINION</u>

Qui tam relator Edward Breslow alleges that defendants JP Pharma, LLC d/b/a Kare Pharmacy and Compounding, and Jay Suthar, have violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, and the Virginia Fraud Against Taxpayers Act ("VFATA"), Va. Code Ann. § 8.01-216.1 <u>et seq.</u>, by submitting false claims, and/or making false statements material to false claims, to Medicare, Medicaid, and Tricare. The United States and the Commonwealth of Virginia declined to intervene in the case at large, <u>see</u> ECF No. 17, though the United States has since intervened solely on the issue of the constitutionality of the FCA's qui tam provision. <u>See</u> ECF No. 108. The matter is before the court on defendants' renewed motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), ECF No. 97, and motion to dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1), ECF No. 96.

For the reasons stated below, the court **DENIES** the motion to dismiss for failure to state a claim, ECF No. 97 and **DENIES** the motion to dismiss for lack of subject matter jurisdiction, ECF No. 96.

I. **Background**

This is a qui tam case brought by relator Edward Breslow. Breslow alleges that JP

Pharma, LLC d/b/a Kare Pharmacy and Compounding and its owner Jay Suthar fraudulently

billed Medicare, Medicaid and Tricare. First Amended Complaint, ECF No. 58, ¶1 (hereinafter

"Compl."). As the court addresses the case on a motion to dismiss, the court considers all

well-pleaded allegations in the complaint as true and recounts the allegations in the light most

favorable to the plaintiff. See Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th

Cir. 2017).

Breslow, the relator, is a long-time licensed pharmacist who worked for defendants in

at least 2018 and 2019. Compl. ¶¶ 4, 19, 62. "Beginning in June 2018," Breslow served as the

Chief Operations Officer ("COO") of Kare Pharmacy and Compounding, which is a fictitious

or d/b/a name for JP Pharma, LLC. Id.¶¶ 22, 62. Through his role as COO, Breslow had

access to prescription and other data relevant to the allegations in this lawsuit. Id. ¶62.

Defendants in this lawsuit are JP Pharma, LLC d/b/a Kare Pharmacy and

Compounding, and its sole owner, Jay Suthar. Id. ¶22. Though only two defendants are named

in the lawsuit, other relevant parties discussed are Suthar's sister, Dr. Tejal Raju, Suthar's

cousin, Prenav Suthar, and Katherine Duff, a physician's assistant who worked with Raju. See

id. ¶¶ 2, 63.

JP Pharma, LLC and Jay Suthar owned and operated five pharmacies during the

relevant time period. Id. ¶22. These pharmacies included Kare Pharmacy and Compounding

locations in Danville and Roanoke, VA, a Kare Pharmacy and Compounding location within

Sovah Health Hospital in Danville, VA, a Ridgeview Pharmacy in Parker, CO, and a

PharmaCare Rx in Mt. Juliet, TN. Id. The complaint alleges that these pharmacies are inactive or, in the case of the location in Sovah Health Hospital, lack entries in state records of their existence. See id. ¶23.[1]

The pharmacies at issue in this lawsuit were compounding pharmacies, which means that alongside dispensing standard formulation name-brand and generic drugs, the pharmacies would also compound (and dispense) various drug active ingredients into bespoke formulas to fit patient needs. See, e.g., Compl. ¶¶24-27. For example, a pharmacist may "customize medications based upon a doctor's prescription to meet a patient's particular needs" including by "1) customizing the strength or dosage, 2) adding flavor … to make it more palatable …, 3) reformulating the drug to exclude an unwanted, nonessential ingredient, …, or 4) changing the form of the medication for patients who… have difficulty swallowing or experience stomach upset when taking oral medication." Id. ¶26.

In order for compounded drugs to be covered by Medicare, Medicaid, or Tricare, the drug must satisfy certain requirements. See id. ¶¶24-55. For Medicare Part D, which is "an optional prescription drug benefit for Medicare beneficiaries," Part D sponsors are allowed "to cover a compounded drug if the compounded drug … contains at least one active ingredient that meets the definition of a Part D drug—meaning that it would be covered by Part D if it were dispensed separately; and does not contain any ingredients that would be covered under Medicare Part B." Id. ¶29. For Medicaid programs, pharmacies are paid "the lower of (a) the state's estimate of the drug's acquisition cost to the pharmacy, based on a state

---

[1] The complaint also mentions a Suthar LTD and a Suthars, Inc. See Compl. ¶¶22-23. These entities do not appear to be otherwise relevant to the facts of the case.

determined formula, plus a dispensing fee, or (b) the pharmacy's usual and customary charge to the general public." Id. ¶31. "In Virginia, the Medicaid program requires pharmacies such as [d]efendants to provide their usual and customary charges for all prescriptions dispensed." Id. For Tricare, prescription drugs are reimbursable if the drug is both "medically or psychologically necessary [for] the diagnosis and treatment of illness or injury," and "prescribed for either an FDA-approved indication or be supported by 'reliable evidence…'" Id. ¶38. In order for a pharmacy to be reimbursed by Tricare for compounded drugs, the pharmacy "must enter into a Provider Agreement with" Express Scripts, Incorporated ("ESI"), or contract with a Pharmacy Services Administrative Organization ("PSAO") to contract with ESI on the pharmacy's behalf. Id. ¶¶44-45. "At all relevant times" JP Pharma had contracted with a PSAO and thus was subject to a Provider Agreement with ESI. Id. ¶45. The relevant Provider Agreement obligated defendants to collect copays from patients, and not waive those copayments unless directed to do so by ESI. Id. ¶47.

Breslow alleges "[d]efendants falsified prescription information, misled treating physicians, modified or replaced ingredients in medications, induced patients with free products, failed to accurately report their costs, and dispensed commercially available medications which were not medically necessary, all to increase profits at taxpayer expense." Compl. ¶1. Breslow also alleges that "[d]efendants… falsified their reported U&C [usual and customary charge] amounts when they failed to report the original prescriptions which were provided [to patients] for free." Id. ¶31.[2]

---

[2] For Tricare, the relevant definition of U&C applicable to compounded claims is "the usual and customary retail price of a covered medication in a cash transaction at the dispensing pharmacy (in the quantity dispensed)

Defendants' scheme, as alleged, was multi-layered. First, Prenav Suthar, defendant Jay Suthar's cousin, led "data analysts" who performed "testing" to determine which combination of ingredients in compounded medications and/or which standard formulation medications, like Taliva Softgel, a prescription multi-vitamin supplement, would be approved by state and federal insurance programs and/or pharmacy benefit managers. Id. ¶¶ 7, 69-72. With this information on-hand, defendants would seek reimbursement for the highest-reimbursing drugs and compounds possible. In order to do this, defendants, through "commission-based marketers," met with physicians and "encouraged them to select a compounded product from a preprinted prescription pad for their patients." Id. ¶10. The preprinted pad had, on the left side, common compounded medication formulas, and on the right side, non-compounded drugs that were reimbursable. See id. at 16 (image of prescription pad). On the right side of the pad was included an authorization statement, stating, "I authorize the pharmacy to dispense the topicals below separately, omitting redundant therapy ingredients." Id.

When a doctor prescribed a compounded prescription[3] using the left-hand section with the compounded formulas, defendants would prepare the compounded formula, but advise the doctor that the compounded formula had not been approved for reimbursement by insurance. See, e.g., id. ¶¶ 76-87. Defendants would not check with the insurer to see if the compounded formula was reimbursable. Id. Relator alleges that certain prescribers "knew"

_____

on the date the medication is dispensed, including any discounts or special promotions offered on such date." Compl. ¶50.

[3] Or a standard formulation prescription covered by government insurance for which "[t]he profit margin… was not acceptable to [d]efendants." See, e.g., Compl. ¶76.

that the compounded medication they prescribed would not be approved by government insurance. Id.

Defendants would then ask the doctor for approval to prescribe an alternative drug, id., or, at times, would not seek such approval from the doctor to change the prescription. See id. ¶58 ("Due to the ever-changing nature of pharmacy reimbursements, Kare would often find newer and higher reimbursing drugs which were not referenced on the pads. When they did, they would further either contact the prescriber to get approval to submit for the new drug, or simply falsify the prescribers approval of the new prescription and dispense it anyway."). Defendants would then provide the patient an alternative drug, and defendants would seek reimbursement for that alternative drug. Id. ¶¶ 76-87.

Alongside providing the patient the alternative drug, defendants would provide the patient the original compounded drug that the patient's physician had prescribed them.[4] Id. Defendants would not seek reimbursement for the compounded drug, nor would they seek a copay from the patient for the compounded drug. Id. Defendants instead chose to absorb the financial loss associated with giving patients the compounded drugs for free. Id. Patients would receive both the originally prescribed drug *and* the highly-reimbursed alternative drug.

The point of this scheme was to seek reimbursement for the highest-reimbursing drugs possible, while still providing patients the compounded drugs that they had been originally prescribed by their respective doctors. This allegedly made financial sense to defendants

---

[4] Defendants deny the factual allegation that they provided free compounded medications to customers and waived copays. See 12(b)(6) Mot. at 15, 15 n.6. Defendants state that this practice was prohibited by the policies and procedures of defendants, and Jay Suthar "repeatedly instructed and reprimanded employees for violating these procedures." Id. at 15 n.6.

because defendants would be getting reimbursed for higher-reimbursing drugs. To relator, this constitutes fraud actionable under the FCA.

Alongside the scheme discussed above, relator also made additional allegations of fraud, including three allegations of Virginia Medicaid fraud for seeking reimbursement for drugs that were not prescribed by the patients' respective treating physician. Compl. ¶¶88-90; but see ECF No. 103 at 12-13 (hereinafter "Reply 12(b)(6)") (defendants state that "[u]pon information and belief, [these] prescription[s] [were] filled at another pharmacy," two of these patients had commercial insurance, not Medicaid, and the third had Medicare, not Medicaid).

To demonstrate the scheme(s), relator includes a "representative sample" of fifteen patients. Id.¶¶ 76-90. Defendants counter that they "were unable to verify prescription records for thirteen of these patients, and none of the examples establish that JP Pharma submitted any false claim to a government health program." Reply 12(b)(6) at 11-14. Defendants note that for at least eight of the patients in the sample, the prescriptions were filled by another pharmacy, and not by defendants. See id. (Patients D, G-H, J, L-O).

Relator alleges defendants' scheme constitutes fraud as defendants' claims submitted to the government entities were "the fruit of illegal beneficiary inducements," and thus false or fraudulent claims as a matter of law. See Compl. ¶¶94-97. In other words, relator alleges that because defendants gave patients free compounded drugs alongside the second drug for which defendants sought reimbursement, and/or waived copays for the compounded drugs, defendants were improperly inducing patients to return to defendants for business. Thus, when defendants submitted claims for reimbursement to the government for the alternative drugs, defendants were falsely stating to the government that the claims were in compliance

with all applicable regulations, as each government entities' respective regulations incorporated anti-kickback laws. (Relator alleges that compliance with anti-kickback laws is material to the government's decision to pay a claim. Id. ¶¶102-111.) Defendants were also allegedly making false statements to the government by failing to include in claims that defendants were providing patients compounded drugs for free.

### A.    Procedural History

Breslow originally filed his complaint under seal in December 2019. See ECF No. 1. In August 2022, following five extensions of time requested by the government, the United States and the Commonwealth of Virginia declined to intervene in the case. See ECF No. 17. Defendants then moved to dismiss the original complaint in March 2023. ECF No. 27. At that time, defendants did not make a 12(b)(1) motion. See id. Shortly thereafter, the parties filed a motion to stay the case pending the parties' settlement negotiations. See ECF No. 29. The court granted this six-month motion to stay. See ECF No. 30. Six months later, the parties sought an additional six-month stay on the same grounds. ECF No. 31. The court granted this motion to stay. ECF No. 32. The parties then finished briefing for the first round of motions to dismiss. See ECF Nos. 38, 39. The court held a hearing on the first motion to dismiss on December 15, 2023, and granted the motion. See ECF Nos. 51, 53, 59. The court granted the motion as to relator's FCA and VFATA claims without prejudice, finding that relator had failed to plead the FCA and VFATA claims with particularity under Fed. R. Civ. P. 9(b) and had also failed to state a claim under Fed. R. Civ. P. 12(b)(6) due to failure to adequately plead falsity and scienter. Id. The court granted the motion as to relator's reverse FCA claim with

prejudice, finding that relator would not be able to state a reverse FCA claim even if allowed leave to amend. Id. The court then set the case for trial in December 2024. ECF No. 54.

Relator filed an amended complaint in January 2024. ECF 58. In his amended complaint, relator brought six claims against defendants JP Pharma, LLC d/b/a Kare Pharmacy and Compounding, and Jay Suthar: **Claim One**: False or Fraudulent Claims under the FCA, 31 U.S.C. § 3729(a)(1)(A), against Kare Pharmacy and Compounding; **Claim Two**: False or Fraudulent Claims under the FCA, 31 U.S.C. § 3729(a)(1)(A), against Jay Suthar; **Claim Three**: False Records or Statements Material to False Claims under the FCA, 31 U.S.C. § 3729(a)(1)(B), against Kare Pharmacy and Compounding; **Claim Four**: False Records or Statements Material to False Claims under the FCA, 31 U.S.C. § 3729(a)(1)(B), against Jay Suthar; **Claim Five**: Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, et seq., against Kare Pharmacy and Compounding; and **Claim Six**: Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, et seq., against Jay Suthar. Id. ¶¶116-154.

Defendants moved to dismiss the amended complaint later in January 2024 and also answered the complaint. ECF Nos. 60-62. Defendants did not raise a constitutional challenge at this point. See id. The parties fully briefed the motion to dismiss, and the court set a motion hearing for late April 2024. See ECF Nos. 63, 64, 66. Before that hearing, relator moved for a stay of discovery pending outcome of the motion to dismiss (on grounds of expense involved in discovery), while defendants moved to stay all deadlines for 120 days "or until such time as the United States Attorney for the Western District of Virginia's related criminal investigation is resolved." See ECF Nos. 67, 68. The court granted defendants' motion, and denied relator's motion as moot. ECF No. 71. In July 2024, the parties asked the court to extend the stay for

an additional period of 120 days, again citing the active criminal investigation as grounds for the stay. ECF No. 77. The court granted the stay. ECF No. 79. After a conference with the parties at the end of that stay in December 2024, the court extended the stay until April 24, 2025. ECF No. 86. The court received notification on April 23, 2025, that the United States had declined to criminally prosecute defendants. See ECF Nos. 87, 88.

Following the declination decision, the court held a conference with the parties, and the parties subsequently entered an agreed briefing schedule. See ECF Nos. 88, 81. Defendants filed a renewed motion to dismiss the amended complaint, ECF No. 58, under Fed. R. Civ. P. 12(b)(6), on May 15, 2025. See ECF No. 97-1 (hereinafter "12(b)(6) Mot."). Alongside their 12(b)(6) challenge, defendants also filed a constitutional challenge to relator's complaint. See ECF No. 96-1 (hereinafter "12(b)(1) Mot."). Defendants provided the required notice of constitutional challenge under Fed. R. Civ. P. 5.1(a) on May 15, 2025. See ECF No. 98.

On May 27, 2025, the United States Attorney's Office advised the court via email that "[t]he United States is in receipt of the Rule 5.1 notice and expects to make an intervention decision well within the 60-day window provided by the rule." The court subsequently ordered that, should the United States decide to intervene, the court would accept further briefing and argument on the issue of constitutionality from the government, and, if they wish, from the parties. See ECF No. 101. The court further advised the parties that it would not rule on the motions to dismiss until the government's 60-day period had expired. See ECF No. 101.

Relator opposed defendants' motions on May 29, 2025. See ECF No. 99; ECF No. 100 (hereinafter "Opp. 12(b)(6)"). Defendants then replied in support of their motions on June 5, 2025. See ECF No. 102; ECF No. 103 (hereinafter "Reply 12(b)(6)").

On June 18, 2025, the court heard argument on defendants' 12(b)(6) motion, and ordered the parties to make, within ten days, a supplemental filing. ECF Nos. 104-105. At the hearing, the court declined to hear argument on the 12(b)(1) motion. The parties duly made their supplemental filings within the time allowed. See ECF Nos. 106-107.

On July 7, 2025, the United States filed a notice of intervention pursuant to 28 U.S.C. § 2403(a). See ECF No. 108. The United States advised that it was exercising its right to intervene in the matter "for the limited purpose of defending the constitutionality of the qui tam provisions of the False Claims Act (FCA), 31 U.S.C. § 3729, et seq." Id. at 1. The court then ordered the parties to abide by a briefing schedule on the constitutional issue. See ECF No. 109. The United States filed its opposition to defendants' 12(b)(1) motion on August 6, 2025. See ECF No. 110. Defendants subsequently filed an additional reply in support of their 12(b)(1) motion on August 20, 2025. See ECF No. 111.

## II.    Jurisdiction and Venue

The court has jurisdiction in this case pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a). The court has jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a) because acts committed by defendants occurred in the Western District of Virginia, and because defendants can be found in, resides, and/or transacts business in the Western District of Virginia.

Venue is proper in the Western District of Virginia under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391 (b)(2) because a substantial part of the events giving rise to the claims alleged in this action occurred in the Western District of Virginia.

## III.    Rule 12(b)(6) Motion

Defendants moved to dismiss relator's complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and for failure to plead fraud with particularity under Fed. R. Civ. P. 9(b). Defendants argue that "[r]elator simply has not alleged that [d]efendants submitted false claims to the [g]overnment" as "[a]bsent an allegation of a kickback payment to a doctor or other prescriber, the facts, as alleged…, simply do not amount to a violation of the FCA, AKS [Anti-Kickback Statute], or VFATA," and, what's more, relator's complaint "lacks sufficient particularity to survive scrutiny under Rule 9(b)." 12(b)(6) Mot. at 1.

### A.    Legal Standard

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). In evaluating a motion to dismiss under Rule 12(b)(6), a court must consider all well-pleaded allegations in a complaint as true and construe them in the light most favorable to the plaintiff. Wikimedia, 857 F.3d 193 at 208.

In addition to satisfying this general plausibility standard, the allegations of fraud under the AKS, FCA and VFATA in this case must also satisfy the heightened pleading standard of

Rule 9(b). Rule 9(b) states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); see also United States ex rel. Taylor v. Boyko, 39 F.4th 177, 189 (4th Cir. 2022). "These circumstances are often referred to as the who, what, when, where, and how of the alleged fraud." United States ex rel. Wheeler v. Acadia Healthcare Co., 127 F.4th 472, 485 (4th Cir. 2025) (citing Boyko, 39 F.4th at 189 and United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008)). Such details are required "to prevent frivolous suits, stop fraud actions where everything is learned after discovery (i.e., fishing expeditions), and to protect defendants' reputations." United States ex rel. Nicholson v. MedCom Carolinas, Inc., 42 F.4th 185, 195 (4th Cir. 2022). At the same time, "[w]hile . . . significant detail [is required], '[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" Id. (quoting Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999)).

### B.    Analysis

In his complaint, relator alleges defendants engaged in beneficiary inducements in violation of the Anti-Kickback Laws and Civil Monetary Penalty Laws. Relator alleges that when a patient was prescribed a compounded medication that was not covered by Tricare or Medicare, Defendants would ask the prescribing doctor to write a new prescription for an alternative or substitute that would be highly reimbursed by the government. (Or, when the

doctor was unavailable, that Defendants would alter the prescription themselves to a highly-reimbursed alternative). Defendants would submit the claim for the highly-reimbursed alternative, and would give both the alternative drug and the original drug to the patient. And in order to make sure patients kept that medication or did not object to the alternative, they gave them that originally-prescribed medication for free. This free medicine was a kickback, relator alleges, and submitting only the alternative medication to government-funded insurance – with no intention for the patient to actually use it – constitutes a false claim under the False Claims Act and VFATA. Compl.

In response, defendants argue that relator has failed to state an FCA claim. See 12(b)(6) Mot., ECF No. 97.

For the reasons stated below, the court finds that relator has alleged sufficient facts to support a reasonable inference that defendant engaged in those beneficiary inducements and submitted those claims to the government. The court also finds that the relator has alleged those facts with sufficient particularity to meet the Rule 9(b) standard.

The False Claims Act (FCA) provides, in relevant part:

> [A]ny person who—
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> (C) conspires to commit a violation of subparagraph (A), (B), . . . or (G);
> . . . ; or
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and

improperly avoids or decreases an obligation to pay or
transmit money or property to the Government,

is liable to the United States Government for a civil penalty of
not less than $5,000 and not more than $10,000, as adjusted by
the Federal Civil Penalties Inflation Adjustment Act of 1990,
plus 3 times the amount of damages which the Government
sustains because of the act of that person.

31 U.S.C. § 3729(a)(1)(A)-(C), (G). In an FCA action brought by relators in which the United

States declines to intervene, relators "shall receive an amount which the court decides is

reasonable for collecting the civil penalty and damages" and which "shall be not less than 25

percent and not more than 30 percent of the proceeds of the action or settlement and shall be

paid out of such proceeds." 31 U.S.C. § 3730(d)(2).

Relator brings two types of FCA claims: "presentment claims" under 31 U.S.C. §

3729(a)(1)(A) (Claims One and Two) and "false-record-or-false-statement claims" under §

3729(a)(1)(B) (Claims Three and Four). Both types of FCA claims require relator to allege four

elements: "(1) that the defendant made a false statement or engaged in a fraudulent course of

conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3)

the statement or conduct was material; and (4) the statement or conduct caused the

government to pay out money or to forfeit money due." United States ex rel. Harrison v.

Westinghouse Savannah River Co., 352 F.3d at 913 (citation omitted); Nicholson, 42 F.4th at

193. These elements must be pled with particularity under Fed. R. Civ. P. 9(b).

The court proceeds by reviewing whether relator sufficiently alleged facts to support

the falsity, scienter, materiality, government payment, and presentment requirements of an

FCA claim. Finding that relator has satisfied these requirements, the court **DENIES** the

motion to dismiss.

### 1.    Falsity

The first element that a relator must adequately plead with the particularity required by Rule 9(b) is falsity. "'False' and 'fraudulent' are not defined in the FCA, but 'it is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses.'" U.S. ex rel. Miller v. Reckitt Benckiser Group PLC, 698 F. Supp. 3d 889, 910 (W.D. Va. 2023) (quoting Universal Health Services, Inc. v. U.S. ex rel. Escobar, 579 U.S. 176, 187 (2016)). "Thus, falsity encompasses express falsehoods, as well as omissions and misrepresentations amounting to half-truths." Id. (citing the same). The fraudulent conduct alleged here is two-fold: that the claims were based on invalid, altered, or medically unnecessary prescriptions, and that the claims were the result of unlawful patient inducements. Relator has adequately plead falsity as to both.

### a)    Claims Based on Invalid, Altered, or Medically Unnecessary Prescriptions

First, relator pleads that the prescriptions on which the claims were based were in fact false, altered, or medically unnecessary. Relator alleges regarding falsification, modification, and lack of medical necessity:

- "Defendants undertook a scheme to substitute or modify the prescriptions in a way which was solely intended to maximize the [d]efendants' reimbursement." Compl. ¶11.
- "Due to the ever-changing nature of pharmacy reimbursements, Kare would often find newer and higher reimbursing drugs which were not referenced on the pads. When they did, they would further either contact the prescriber to get approval to submit for the new drug, or simply falsify the prescribers approval of the new prescription and dispense it anyway." Id. ¶58.
- "Defendants would … simply modify the prescription without prescriber signoff and fill it however [d]efendants wanted." Id. ¶72.
- Defendants would "falsify[] the prescribers' order themselves." Id. ¶73.

- "[T]he high value replacement prescription was not remotely medically necessary" and, when provided alongside the original, compounded prescription, was "rendered medically unnecessary as the result of an unlawful kickback." Id. ¶61.

Relator argues that his complaint satisfies Rule 9(b) as the complaint provides the who, what, when, where, and how of the alleged fraudulent schemes. See Opp. 12(b)(6) at 21-23.

The court finds that relator has sufficiently alleged the who, what, when, where and how of his allegations of medically unnecessary prescriptions – but not his allegations of falsified prescriptions.

As to false or altered prescriptions, relator does not plead with the requisite particularity that defendants altered or falsified prescriptions. Relator includes a representative sample of patients whose claims defendants improperly billed the government. See Compl. ¶76-90. For most of these examples, relator does not allege that the prescriptions were materially altered or falsified. In this sample, relator alleges that for Tricare Patients A, C, D, and E, Medicare Patients F, G, and H, and Virginia Medicaid Patients I, J, K, and L, the prescribing medical provider "rewrote" or "approved" any changes to the prescriber's initial prescription. See id. ¶¶76, 78-87. As to Tricare Patient B, the prescribing doctor was "contacted… and advised… that a substitute formula … was approved." Id. ¶77. Thus, as to the majority of relator's representative sample, the prescribing medical provider directly approved the prescription for which defendants ultimately sought reimbursement. In other words, relator has not specifically alleged that defendants altered a prescription for these patients.

Additionally, and as defendants point out, "the [c]omplaint contains no patient-specific examples" to support the "serious accusation" that defendants "'falsified' physician approvals

17

when they could not reach the prescriber."[5] Reply 12(b)(6) at 15. Though relator alleges that defendants lacked prescriber approval for the alternative medication provided to Virginia Medicaid Patients M, N, and O, relator's allegations as to these patients are far from specific, as defendants point out. See 12(b)(6) Mot. at 24. Relator alleges that as to these patients, an unnamed provider had prescribed a compounded medication, which defendants provided to the patient for free, while also providing the patient a commercially available medication which defendants submitted to Medicaid for reimbursement. See Compl. ¶¶88-90. For this commercially available medication, however, relator alleges only that a specific doctor's office did not prescribe the medication to the patient. See id. ¶88 (Virginia Medicaid Patient M: "Relator learned that the Dr. Wesley Turner's office did not prescribe this medication for the patient which resulted in a fraud on Medicaid."); ¶89 (Virginia Medicaid Patient N: "Relator learned that Dr. Michael Canava's office did not prescribe this medication for the patient which resulted in a fraud on Medicaid."; ¶90 (Virginia Medicaid Patient O: "Relator learned that the office of Dr. Makunda Abdul-Mbacke did not prescribe this medication for the patient which resulted in a fraud on Medicaid.").[6] Relator fails to allege that the specific provider who did not prescribe the commercially available medication was the same provider that prescribed the compounded medication. Relator's omission is important because it demonstrates a lack

---

[5] Though relator pleads as to Tricare Patient A that "[d]efendants fraudulently changed the prescription to one that reimbursed at a higher rate," Compl. ¶76, relator earlier in that paragraph notes that the prescribing physician "approved" the prescription change. See id.

[6] Defendants argue that for Virginia Medicaid Patients M and O, "[u]pon information and belief, this prescription was filled at another pharmacy … [and] reimbursed by commercial insurance, not Medicaid," and as to Virginia Medicaid Patient N, that "[u]pon information and belief, this prescription was filled at another pharmacy and reimbursed by Medicare, not Medicaid." See Reply 12(b)(6) at 13 (emphasis in original). As the court construes the facts in the light most favorable to the non-movant at the motion to dismiss stage, the court does not address these alleged factual discrepancies at this stage.

of specificity into the mechanics of what occurred. Relator does not allege how the patients were prescribed medication if it was not done by a non-pharmacy provider, nor how the prescription was entered into the pharmacy log without the proper documentation, nor even whether documentation was normally provided to evidence the pharmacy log. Relator does not allege who facilitated this allegedly fraudulent prescription. In other words, relator has failed to plead the fraudulent acts with specificity that he generally alleges occurred.

However, relator pleads with the requisite particularity that prescriptions were medically unnecessary. Relator alleges that "[d]efendants' changes to the original prescription caused Medicare to approve and reimburse a medically unnecessary medication to the patient," Compl. ¶82 (Medicare Patient G). These medications were medically unnecessary, relator alleges, because they were provided in addition to the originally prescribed drug.

In their briefs, defendants argue that relator's assertion of "medical necessity fails as a matter of law" because the drugs that were reimbursed were validly prescribed. 12(b)(6) Mot. at 8. "Relator does not allege any facts suggesting an improper or illegal practice constituting fraud." 12(b)(6) Mot. at 8-9, see also Reply 12(b)(6) at 5-6. Defendants cite to the 11th Circuit in United States v. AseraCare, Inc., 938 F.3d 1278, 1297 (11th Cir. 2019), to say that "[t]he FCA does not permit second-guessing a physician's medical judgment, especially absent allegations that the doctor acted knowingly or with fraudulent intent." Reply 12(b)(6) at 5. AseraCare – which was specific to the hospice care context – held that a claim of terminal illness "based on the physician or medical doctor's clinical judgment…cannot be false—and thus cannot trigger FCA liability—if the underlying clinical judgment does not have an objective falsehood." AseraCare, 938 F.3d at 1296-1297. And an "objective falsehood" can be

shown where "the clinical judgment on which a claim is based contains a flaw that can be demonstrated through verifiable facts." Id., 938 F.3d at 1297.

Here, relator alleges such flaws.

Relator alleges that, in order to obtain the second prescription, defendants indicated to the prescribing doctors that the new prescription was "alternative" or a "substitute":

- "Defendants notified Dr. Richardson that the original prescription was not covered but that an alternative topical formula was within the patient's formulary." Compl. ¶76 (Tricare Patient A).
- "Defendants contacted Dr. N. Wynta Williams and advised her that a substitute formula with Lidocaine and Tetracaine was approved." Id. ¶77 (Tricare Patient B).
- "Defendants contacted Certified Family Nurse Practitioner Samantha Smith and advised her that a substitute formula with Lidocaine and Tetracaine was approve." Id. ¶77 (Tricare Patient C).
- Defendants contacted Dr. Grant-McDonald and advised her that a substitute formula with Lidocaine and Tetracaine was approved. Id. ¶79 (Tricare Patient D).
- "Defendants contacted Dr. Michael Rayno and advised him that a substitute formula with Lidocaine and Tetracaine was approved." Id. ¶80 (Tricare Patient E).
- "Defendants contacted PA Katherine Duff and advised her that a substitute formula with Hydrocortisone Butyrate was approved." Id. ¶81 (Medicare Patient F).
- "Defendants contacted Dr. Minesh Shah and advised that a substitute formula with Betamethasone Dipropionate Cream (a Corticosteroid) was approved." Id. ¶82 (Medicare Patient G).
- "Defendants contacted Dr. Code Drake and advised him that a substitute formula with Hydrocortisone Butyrate was approved." Id. ¶83 (Medicare Patient H).
- "Defendants contacted Dr. Rachel McGee and advised her that a substitute formula with Atopaderm cream, Taliva Softgel, and Nudiclo Solupak was approved." Id. ¶84 (Medicare Patient I).
- "Defendants contacted Dr. Wesley Turner and advised her that a substitute formula with Atopaderm cream was approved." Id. ¶85 (Medicare Patient J).
- "Defendants contacted Dr. Nada Owusu and advised that a substitute formula with Atopaderm cream was approved." Id. ¶86 (Medicare Patient K).
- "Defendants contacted Dr. Victor Owusu and advised him that a substitute formula with Lidocaine 3% was approved. … The following month, Defendants contacted Dr. Owusu advising that the original prescription for Lidocaine 3% was no longer covered but that a substitute formula with Calcipotriene was approved." Id. ¶87 (Medicare Patient L).

Relator alleges that these "alternative," "replacement" or "substitute" medications were not actually substituted or given as an alternative to the uncovered original prescription. See, e.g. id. ¶72 (alleging that defendants would tell doctors that "one of the medications they prescribed was 'no longer covered by insurance' but that they had a substitute or replacement medication that was prescribed.") But in each representative example, the "alternatives" or "substitutes" were provided *in addition to* the originally prescribed drug, allegedly rendering them medically unnecessary. Id. (generally), see also id. ¶61 ("in every instance in which the replacement prescription was provided along with the original prescription (for free) it is rendered medically unnecessary as the result of an unlawful kickback.")

This is more than a conclusory statement that these medications were medically unnecessary. In many of these examples, Relator also alleges that defendants would indicate to the physician that they had identified the "alternative" or "substitute" not because of its medical necessity, but because it could be reimbursed by the government: "[d]efendants told the physician that they would identify another approved medication to bill [TRICARE/Medicare] in exchange for providing the original compounded medication to the patient free of charge." Id. ¶77-87 (Tricare Patients B, C, D, E, Medicare Patients F, G, H, I, J, K, L). Relator alleges that defendants did not submit the extra/original medication to Medicare or Tricare for approval or reimbursement. Id. ¶ 77-97. As far as Medicare, Medicaid and Tricare were concerned, that free prescription medication was given under the table.

Relator also alleges that defendants' conduct confirmed this lack of medical necessity when they told patients to discard the medications paid for by Medicare, Tricare, and Medicaid. "Per [r]elator's conversations with Christine Pascual, head of Kare's call center, patients asked

what to do with the noncompound medications they received, which they did not need, and were often unaware they were prescribed. Kare customer services representatives would instruct them to discard the medications, which were in-fact the highly reimbursed medications. If a customer requested that only the compound be sent in the future, representatives informed the patient that it would result in the compound being billed as a cash pay directly to the patient and not covered by their insurance." Id. ¶65.

The fact that the secondary prescription was valid, in the alleged context, does not foreclose the claim that it was nonetheless medically unnecessary.

Billing state-sponsored insurance for medically unnecessary treatments can amount to a false claim under the False Claims Act. See, e.g. Omni Healthcare, Inc. v. MD Spine Sols. LLC, 761 F. Supp. 3d 356, 364 (D. Mass. 2025) (a laboratory "violates the FCA if it knows that it is submitting claims for medically unnecessary tests"); see also United States ex rel. Riedel v. Bos. Heart Diagnostics Corp., 332 F. Supp. 3d 48, 70 (D.D.C. 2018) ("'improper inducements such as providing kickbacks or promoting medically unnecessary testing' is a violation of the False Claims Act"), United States v. Berkeley Heartlab, Inc., 225 F. Supp. 3d 487 (D.S.C. 2016) (denying a motion to dismiss an FCA suit alleging that company's claims for reimbursement from federal health care programs were tainted by kickbacks and that it submitted claims for medically unnecessary services).

Relator sufficiently pleads with particularity that defendants submitted claims for medically unnecessary medications, adequately pleading falsity.

### b)    Anti-Kickback Statute Violations

Additionally, Relator alleges that defendants violated the Anti-Kickback Statute by providing these medications for free. That is the legal underpinning of relator's allegations of falsity based on a patient inducement scheme. The court finds that relator has pled this violation with sufficient particularity.

The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, states:

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b)(2); see also Va. Code Ann. § 32.1-315(B).

A violation of the Anti-Kickback Statute "automatically constitutes a false claim under the False Claims Act." United States ex rel. Lutz v. Mallory, 988 F.3d 730, 741 (4th Cir. 2021) (citing United States ex rel. Lutz v. United States, 853 F.3d 131, 135 (4th Cir. 2017)); see 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."). As defendants point out, "[t]o state a cognizable AKS violation, [r]elator must allege with requisite specificity that [d]efendants (1) knowingly and willingly (2) offered to pay or paid 'remuneration' (3) to induce referrals or program-related business." See 12(b)(6) Mot. at 13-14. Additionally, when pleading a FCA claim based on an AKS violation, relators must plead (4) causation. That is,

they must still satisfy the requirement that "all False Claims Act claims must be linked in some way to presenting a claim for payment to the government." Nicholson, 42 F.4th at 194-95. When, as here, a relator's FCA claim alleges an underlying kickback violation, "the kickback scheme must be pleaded with particularity as well." Nicholson., 42 F.4th at 194–95.

Relator alleges that defendant Kare, at Suthar's direction, "routinely waived, reduced, or failed to collect complete copayment amounts," and "provided otherwise uncovered free prescription creams to patients in order to induce them to use Kare Pharmacy and continue seeking refills." Compl. ¶ 91. Relator alleges that this was done (1) knowingly and willingly both in conclusive fashion and through their descriptions of the defendant's alleged actions. Id. ¶ 94 ("with knowledge and approval, knowingly and willfully paid"), ¶ 77-87 ("Defendants told the physician that they would identify another approved medication to bill [Medicare/TRICARE] in exchange for providing the original compounded medication to the patient free of charge"). He also specifically alleges (2) remuneration, in the form of the free medications and waived payments or copayments for those free medications, Compl. ¶ 91, and (3) that the intent of that remuneration was to streamline Kare's practice of billing Medicare and Tricare for highly-reimbursed alternative medications that they do not intend for patients to need or use. Id. ¶ 91 ("Kare provided otherwise uncovered free prescription creams to patients in order to induce them to use Kare Pharmacy and continue seeking refills. Kare engaged in this conduct for the express purpose of submitting and collecting on claims for covered drugs."); 92-93 (alleging a connection between the waiver of copayments and an intent "to induce patients to purchase compounded drugs"). Relator alleges specifically that this remuneration (4) caused there to be a false or misleading claim presented to the

government. Id. ¶ 95-100 ("[i]n submitting claims for compounded pain creams to Medicare Part D and TRICARE programs, Kare and Suther made representations about the goods or services provided. These representations included, among other things…the drug(s) dispensed…These claims were not true, accurate, or complete because they did not disclose a violation of the AKS resulting from Kare's failure to collect patient copayments and provision of … free products.")

Defendants make several arguments that this is not enough.

For one, defendants argue that their choice to waive any payment due for the drug they provided for free cannot be 'remuneration.' They argue the plaintiff's copay waiver theory is "illogical and factually deficient" as "[a] copay only exists when a medication is covered by insurance. If a compound is not reimbursable, there is no copay to waive—there is no reimbursement at all." Reply 12(b)(6) at 9. And providing patients "a single 'free' tube of a non-covered compound drug" could not induce loyalty and repeat government-reimbursed prescriptions, they say, because "compound medications are typically not chronic, recurring prescriptions… where patients return month after month for controlled substances or maintenance medications." Id. at 10-11.

Surely, if a compound is not reimbursable there is no copay to waive. But the price tag to the medication itself is waived when it is provided to the patient free of charge. Something of value was given. And courts have acknowledged that beneficiary inducement schemes that constitute violations of the Anti-Kickback Statute take many forms. See, e.g. United States ex rel. Hart v. McKesson Corp., 96 F.4th 145 (2d Cir. 2024), cert. denied, 145 S.Ct. 163 (2024) (finding AKS violations where drug companies directly offered kickbacks to providers);

Regeneron, 128 F.4th 324 (finding an AKS violation where drug companies covered patients' copayments); United States ex rel. Chin v. CVS Pharmacy, Inc., 2017 WL 4174416 (C.D. Cal. Aug. 15, 2017) (finding an AKS violation where pharmacies offered gift cards to patients); United States ex rel. Heller v. Guardian Pharmacy, LLC, 521 F. Supp. 3d 1254 (N.D. Ga. 2021) (finding an AKS violation where pharmacies offered free or below market services to assisted living and personal care home communities so as to be chosen as a preferred pharmacy).

Free prescriptions could constitute remuneration under the AKS, as courts construe remuneration under the AKS broadly. See, e.g., Pharm. Coalition for Patient Access, 126 F.4th at 960 ("Congress saw fit … to enlarge the scope of the Anti-Kickback Statute's prohibitions by adding those key words ['any' and 'including']. The statute now prohibits 'any remuneration (including any kickback, bribe, or rebate)[.]' … Both 'any' and 'including' are terms of enlargement, which clarify that given examples are merely illustrative."). Another "way a defendant can violate the AKS is to routinely waive patient copayments." U.S. v. Smart Pharm., Inc., No. 3:14-CV-1453-J-39JBT, 2020 WL 10506311, at *7 (M.D. Fla. Dec. 1, 2020) (citing Medicare Claims Processing Manual, Ch. 23, § 80.8.1); see also Compl. ¶¶47, 49 (Tricare Provider Agreement applicable to defendants required that copayments be collected unless otherwise directed by ESI); 12(b)(6) Mot. at 26 ("Relator correctly states that TRICARE beneficiaries are 'required to pay co-pays for medications purchased through the TRICARE program.'" (citing Compl. ¶54)). Relator alleges specifically that defendants would provide the originally-prescribed medication free of charge, eating the wholesale cost of the prescription themselves. See, e.g. Compl. ¶66 ("A prescription report from June 2019 detailed the cost and profits of both the denied and filled medications. The cost of the denied medication to

26

[d]efendants was $64.58. Defendants provided the compounding medication to the customer for free without collecting a co-pay or reporting the transaction. Defendants in turn would go on to collect $1,376.02 from TRICARE every time they refilled the modified prescription and were willing to eat the cost of the original compounding medication. Both the copay waiver and the free medication would be remuneration under the AKS."); ¶88 ("Defendants' pharmacy logs indicate that this product was provided to the patient for free and that Defendants realized a loss on this prescription of $32.45.").

Second, defendants argue that relator's patient inducement scheme does not constitute actionable inducement under the AKS "because it could not have influenced the doctor who ordered the prescription or the patient to order from a particular provider." 12(b)(6) Mot. at 16 (citing United States v. Miles, 360 F.3d 472 (5th Cir. 2004) (remuneration to non-employee marketers who do not make referrals is not a violation of the AKS). This does not address the facts alleged. Relator alleges that the intent of the remuneration was to ensure *patient* compliance with the scheme. Compl. ¶¶ 94 ("Kare, with Suthar's knowledge and approval, knowingly and willfully paid remuneration to Medicare, Medicaid and TRICARE patients to induce the patients to purchase compounded drugs"); ¶ 65 (alleging that patients who asked to not receive the reimbursed medications would be told that they would then have to pay for the otherwise free medication with cash). On its face, the AKS prohibits offering "any remuneration…to induce such person … to purchase any good…for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b. Plainly, a patient can be a "relevant decisionmaker" under the statute. See Miles, 360 F.3d at 480.

27

Notably, the AKS on its face does not require a showing that the remuneration actually induced the intended behavior. It only requires a showing that remuneration was intended to induce that behavior. 42 U.S.C. § 1320a-7b. See also United States ex rel. Greenfield v. Medco Health Sols., Inc., 880 F.3d 89, 100 (3d Cir. 2018) ("The Anti–Kickback Statute prohibits kickbacks regardless of their effect on patients' medical decisions.") Under FRCP 9(b), intent may be alleged generally. Relator's amended complaint has met that burden.

Third, defendants argue that relator failed to plead causation. For an AKS scheme to be actionable under the FCA, the false claim needs to 'result from' the alleged kickback. 42 U.S.C.A. § 1320a-7b(g) ("a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]"). Defendants maintain that relator did not adequately plead that the claims submitted to the government resulted from a violation of the AKS. 12(b)(6) Mot. at 18-19.

Relator specifically alleges how defendants' systematic choice to provide free medication under the table (i.e. without disclosure to government insurers) would cause there to be false claims presented to the government. For one, relator alleges Kare and Suthar "routinely waived, reduced, or failed to collect complete copayment amounts…in order to induce them to use Kare Pharmacy and continue seeking refills." Compl. ¶¶ 91-92. He alleges the free medicine "induced the patients to purchase compounded drugs" in violation of the AKS, and the resulting claims for reimbursement "were the fruit of illegal beneficiary inducements," "per se false or fraudulent," and represented "implicitly" that they were not impacted by outside inducements. Id. ¶¶ 94-97. He alleges that defendants did not report the transaction where they provided free medicine to the government. See, e.g. Id. ¶66. Because

these additional prescriptions went unreported, the representations that defendants filed with Medicare, Medicaid and Tricare "were not true, accurate or complete" and were "therefore a false record[.]" Id. ¶99. Further, failing to disclose the freely provided medications also meant that the defendants' representations of compliance with the AKS with Medicare Part D and Tricare were false. Id. ¶¶ 99-101. Relator alleges that a party's compliance with the Anti-Kickback Statute directly impacts the decision of government insurers to reimburse the secondary prescriptions. Id. ¶38 ("in order to qualify for reimbursement by TRICARE, a prescription must…be 'medically or psychologically necessary [for] the diagnosis and treatment of illness or injury.'"); ¶¶40-49 (Tricare regulations against kickbacks, incorporated into its contracts); ¶52 ("separating cash business from insurance business" is a not usual and customary compound pricing) ¶55 ("[f]ailure to report all transactions results in data discrepancies which skew reimbursement prices"). And relator alleges that the defendants' submission of these claims without disclosure of the kickbacks caused the government to pay the claims when it otherwise would not have. Id. ¶¶ 99-110.

Specifically, defendants argue that here "there is no 'but-for' causation link between the alleged AKS violation and the ultimate submission of a federal claim… [as] the free 'uncovered' medicine given to the patient could not have influenced the doctor that prescribed the second medication that [d]efendants subsequently sought reimbursement for." Id. at 19. Again, relator does not appear to allege that the prescribing doctor was influenced by the free 'uncovered' medicine, but that the patient was.

The defendants ask the court to apply a "but for" causation standard, citing recent guidance from the First, Sixth, and Eighth Circuits. Id. Central to this argument is a 2010

amendment to the AKS. Again, that amendment states in part, "a claim [for payment by a federal healthcare program] that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C.A. § 1320a-7b(g). Defendants rely on case law from the First, Sixth and Eighth Circuits where courts have held that the ordinary meaning of "resulting from," as used in the amendment, means but for causation. See 12(b)(6) Mot. at 18-19 (citing United States v. Regeneron Pharms., Inc., 128 F.4th 324, 328 (1st Cir. 2025); United States ex rel. Martin v. Hathaway, 63 F.4th 1043, 1052 (6th Cir. 2023); United States ex rel. Cairns v. D.S. Med. LLC, 42 F.4th 828, 835 (8th Cir. 2022)).

Relator argues that applying a "but for" causation standard is inappropriate, citing a Third Circuit case that applied a less than "but for" standard. See id. at 16-17 (citing United Greenfield, 880 F.3d 89, 100 (3d Cir. 2018)). In Greenfield, the Third Circuit adopted a "causal link" standard. Id. In that case, the appropriate link required more than a showing of temporal proximity between the kickback scheme and reimbursement claims, but required less than proof that the claims would not have been made "but for" the kickback. The relator was required to show that at least one specific patient for whom reimbursement claims were submitted had been "exposed to a referral or recommendation…in violation of the [AKS]." Id.

Relator also cites an unpublished case from within the Fourth Circuit that has found similarly, along with other out of circuit case law that did not employ but for causation. See id. (citing United States ex rel. Fitzer v. Allergan, 2022 WL 3599139, at *10 (D. Md. Aug. 23, 2022) (declining to apply "but for" causation standard); United States v. Sutter Health, 2024

WL 4112315, at *6 (N.D. Cal. Sept. 6, 2024) (applying a "causal link" standard); United States

ex rel. Hueseman v. Prof'l Compounding Ctrs. of Am., Inc., 664 F. Supp. 3d 722, 741 n.4

(W.D. Tex. 2023) ("This Court is neither bound nor persuaded by the Eighth Circuit's

reasoning [applying "but-for" causation], which has been rejected by numerous courts").

The Fourth Circuit Court of Appeals has not yet weighed in on the appropriate

standard. Because the Fourth Circuit has not yet adopted the stricter "but for" standard, the

court declines to adopt it at this stage in this case. In the judgment of the court, relator has

adequately pled at this stage that providing the patient with free medication under the table is

plausibly connected to claims made by Kare for government payments for the more expensive

medications prescribed for the same malady. Indeed, plaintiff alleges that but for the scheme

in which kickbacks in the form of free medication are provided to patients, there would be no

false claim for the higher priced medication. Whether these allegations are borne out by the

evidence requires further factual development.

Thus the court holds that relator has adequately pled specific allegations of falsity, both

under the theory that the submitted claims lacked medical necessity and under the umbrella

of the Anti-Kickback Statute.

## 2. Scienter

The second element that a relator must adequately plead with the particularity required

by Rule 9(b) is scienter. A defendant "acts with the requisite scienter if they (1) have actual

knowledge of the falsity of the information; (2) act in deliberate ignorance of the truth or

falsity of the information; or (3) act in reckless disregard of the truth or falsity of the

information." Boyko, 39 F.4th at 197 (citing 31 U.S.C. § 3729(b)(1)(A), internal quotations

omitted). "No proof of specific intent to defraud is required." Id. (citing 31 U.S.C. § 3729(b)(1)(B), internal quotations omitted).

The Supreme Court recently articulated the bounds of the scienter requirement in United States ex rel. Schutte v. SuperValu Inc., 598 U.S. 739 (2023). In Schutte, the Supreme Court reiterated that "[w]hat matters for an FCA case is whether the defendant knew the claim was false." Schutte, 598 U.S. at 743. This is a "subjective" standard. "The FCA's scienter element refers to [defendants]' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." Id. at 749.

Thus, in order to evaluate the sufficiency of relator's allegations as to scienter, the court must determine whether the allegations in the complaint, if proven, would establish that defendants had actual knowledge that their claims were false, acted in deliberate ignorance of the truth or falsity of their claims, or acted in reckless disregard of the truth or falsity of their claims. See United States ex rel. Sheldon v. Forest Lab'ys, LLC, 754 F. Supp. 3d 615, 643, 645 (D. Md. 2024) (citing 31 U.S.C. § 3729(b)(1)(A)(i)-(iii)).

For the purposes of this determination, "actual knowledge 'refers to whether a person is aware of information,' or the falsity of the submitted claims, deliberate ignorance refers to persons who are aware of a substantial risk that their statements are false, but avoid taking steps to confirm the truth, and reckless disregard encompasses those who are 'conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway.'" Miller, 698 F. Supp. 3d at 915-16 (quoting Schutte, 598 U.S. at 750).

In the context of a Rule 12(b)(6) motion to dismiss, while "Rule 9(b) permits malice, intent, and knowledge to be alleged generally… relators must still satisfy Rule 8 and include

more than conclusory allegations pertaining to scienter." Miller, 698 F. Supp. 3d at 916 (citing

Boyko, 39 F.4th at 199).

Relator argues that he has established adequate scienter because he has alleged that

defendants knew (1) that the compounded medication would be denied; (2) that waiving the

copay and not submitting a claim for reimbursement for the compounded medication would

mean the government would remain unaware of the prescription for the compounded

medication; (3) that a prescription for the second prescribed drug would be approved by the

patient's insurance plan; and (4) that the second prescribed drug would be reimbursed at an

amount "much greater" than the original compounded medication. Opp. 12(b)(6) at 18.

Relator argues he has also alleged that defendants intentionally and knowingly violated

the AKS by (1) waiving or failing to collect copays for the compounded medications; (2)

providing the compounded medications for free to patients; (3) "[giving] remuneration, in the

form of the free compound medication, to Medicare, Medicaid, and TRICARE patients to

induce these patients to purchase compounded drugs by routinely providing uncovered drugs

for free…"; (4) "submit[ting] replacement prescriptions with higher reimbursement rates"

using information gathered from data mining; and (5) submitting or causing to submit claims

that falsely indicated that the claims did not result from violations of the AKS. Id. at 18-19.

The court finds that relator has adequately pleaded scienter as to the submission of

false claims or as to the alleged AKS violations. Though relator offers conclusory allegations

of scienter, see, e.g. Compl. ¶¶ 118, 121, 126-127, 134, 139, he also offers allegations of fact

that, if proven true, would show that defendants knew they were submitting false claims to

the government.

Here, relator has pleaded that defendants were aware of which drugs had the highest reimbursement rates, Compl. ¶¶ 7, 12, 56, 67, 69, and that defendants did not seek reimbursement for the originally-prescribed compounded medicines, id. ¶¶ 63, 77-90. Relator pleads that defendants intentionally charged the government for one medication (one that was covered, highly reimbursed, medically unnecessary and/or purchased by the patient under the influence of a kickback) while providing the patient with a different one (uncovered, for free, under the table, and the one that the patient thought they would receive). Id. ¶¶ 64-65, 73-88. When patients asked what to do with the secondary, government-funded medication, defendants told them to discard it – demonstrating knowledge that the medication was unnecessary. Id. ¶ 65. He alleges that defendants told doctors that this was the plan, Compl. ¶¶ 77-87, and that if the patient said only wanted the originally-prescribed drug – not the highly reimbursed one – the defendants would inform them that they would be charged full price – demonstrating that the free medication was given on condition of being able to fill the highly-reimbursed prescription id. ¶¶ 65.

The False Claims Act imposes penalties on parties who present false or fraudulent claims, including material "misrepresentations by omission." Escobar, 579 U.S. at 187. Altogether, this particularized set of allegations support a reasonable inference that defendants were aware of a substantial risk that their statements to the government – which allegedly omitted any mention of the controlled drugs that defendants were providing for free – were false, or that defendants were aware of a substantial and unjustifiable risk that their claims were false.

Defendants highlight that there are no allegations of any "internal emails, legal opinions, or whistleblower complaints showing that [d]efendants thought they were violating the AKS or submitting false claims," and also lacks any "allegations of efforts to conceal conduct or circumvent compliance reviews." Reply 12(b)(6) at 17. The court finds this argument unpersuasive at this stage of the proceedings. To be sure, evidence of whistleblower complaints, internal emails, or legal opinions would help establish scienter, but are unnecessary to allege simply that the defendants knew what they were submitting was false or was likely to be false. This argument also pales in the current context, where relator is allegedly the former COO of Kare. Compl. ¶62.

### 3.    Materiality

The third element that a relator must adequately plead with the particularity required by Rule 9(b) is materiality. A relator must adequately plead that the false claim or misrepresentation is material to the government's decision to pay. Harrison, 352 F.3d at 913 (4th Cir. 2003). Material is defined in the FCA as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). For an FCA claim, the materiality standard is "a demanding and rigorous standard, inasmuch as it serves to protect the FCA from being transformed into a vehicle for punishing garden-variety breaches of contract or regulatory violations." United States ex rel. Bonzani v. United Technologies Corporation, 662 F.Supp.3d 217 (D.Conn. 2023).

In his amended complaint, relator alleges that the claims made to insurance for the secondary medications (more specifically, defendants' choice not to disclose the original/primary medication) were material to the government's decision to pay. He alleges

that they were material to the government's decision to pay because (1) Medicare, Medicaid, and Tricare do not pay for medically unnecessary treatment; and because (2) the government's decision to pay is dependent upon an understanding that the claim was not influenced by a kickback.

Citing to Guilfoile v. Shields, 913 F.3d 178, 190 (1st Cir. 2019), relator argues that a violation of the Anti-Kickback Statute is inherently material. Because the antikickback statute was amended in 2010 to say that an AKS violation "constitutes a false or fraudulent claim," then it would be "superfluous if courts had to 'engage in a materiality analysis' after determining 'that a claim resulted from an AKS violation." Opp. 12(b)(6) at 10. Having pled an AKS violation, relator argues that it is unnecessary to separately plead materiality. The Fourth Circuit has not adopted this reasoning, and the court does not do so here.

Nonetheless, the court finds that relator has plausibly alleged particularized facts to support a reasonable inference that the omission of the free prescription from claims submitted to the government was material to the government's decision to reimburse.

For one, relator alleges that Medicare, Medicaid and Tricare do not pay for medically unnecessary treatment. He alleges that the medication was "not remotely medically necessary," see infra, e.g. Compl. ¶ 61. A prescription is only covered under Medicare Part D if it is FDA-approved and use for medically-accepted indications. Id. ¶29. Tricare only reimburses prescriptions that are "medically or psychologically necessary [for] the diagnosis and treatment of illness or injury." Id. ¶ ¶ 38 (citing 32 C.F.R. § 199.4(a)(1)(i)); 39 (Tricare does not pay for abusive situations, which "include the routine waiver of patient copayments and a pattern of claims for services which are not medically necessary or, if medically necessary, not to the

36

extent rendered") (citing 32 C.F.R. § 199.9(b)(1), (3)). The defendant's submissions for payment that omitted key information about the medication's necessity was therefore material to the government's decision to pay. Compl. ¶ ¶ 77 ("[d]efendants' changes to the original prescription caused TRICARE to approve and reimburse a medically unnecessary medication to the patient."), 78-88 (similar).

It was material, relator alleges, both to the government's decision to pay and to the decision of *how much* to pay. Relator alleges that omitting information about the free drugs manipulated usual and customary pricing data. He alleges that Medicaid and Tricare partly base their pricing decisions on the usual and customary charges that pharmacies report they charge. Id. ¶¶ 14, 31, 50-55. And when the defendants' reports omitted the drugs they gave away for free, it was materially false for determinations of usual and customary prices. Id. See also id. ¶27.

A court's analysis of materiality under the FCA "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Escobar, 579 U.S. at 193, (citing 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003)). Here, the recipients of the information – government insurers – have an explicit policy of not paying for medically unnecessary treatments. And defendant's omissions, as alleged, were key information for the government's determination of whether defendants' claims were reimbursable. Relator has sufficiently pled materiality by nature of medical necessity.

Second, and more prominently, relator alleges that defendants' submissions to the government that omitted mention of the free drugs ("kickbacks") violated government regulations. Tricare, Medicare, and Medicaid all specify that the Anti-Kickback Statute applies

to their programs, and failing to disclose that kickback materially altered the government's willingness to pay those claims, he alleges. Compl. ¶ ¶ 14, 39-49, 95-111. Relator alleges that, as a result, defendant's claims to Medicare, Medicaid and Tricare were "false statements and certifications about compliance with the AKS[.]" Id. ¶¶ 134, 140. And the government relied on those certifications when it decided whether to reimburse Kare's claims. Id. ¶ ¶ 135, 140. This was, he alleges, the "reasonable and foreseeable consequence" of the conduct. Id. ¶ ¶ 135, 141. "[C]ompliance with the AKS goes to the very essence of the bargain between [d]efendants and the government." Id. ¶ 104.

The Supreme Court has described this kind of claim as the "implied false certification theory." Escobar, 579 U.S. at 177. Under that theory, "when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment," and such a claim "can be a basis for liability under the [FCA], at least where two conditions are satisfied: first [1] the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second [2], the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." Id. 579 U.S. at 180, 190.

In his amended complaint, relator [1] alleges that the claims that defendants made to the government did more than seek payment. In submitting claims to the government, the defendants allegedly made representations about "the identity of the patient, the identity of the prescriber, the drug(s) dispensed, and the identity of the pharmacy dispensing the drug," all of which informs the government's decisions about how much a patient's copay would be. Compl. ¶ 98. Relator alleges [2] that those representations, because of the undisclosed kickback

38

scheme, "were not true, accurate, or complete." Id. ¶ 99. And the resulting representations to Part D sponsors and downstream entities were also false as a result. Id. ¶ 100.

Defendants point out that when compliance with a statute (here, the AKS) is an express condition of payment, a lack of compliance with the statute is not "automatically dispositive" of materiality under the False Claims Act. Reply 12(b)(6) at 19 (Escobar, 579 U.S. at 178). "A regulatory requirement is not material merely because compliance is a condition for payment; or merely because the government could have declined payment had it known of the noncompliance; or where the noncompliance was 'minor or insubstantial.'" United States ex rel. McIver v. ACT for Health, Inc., 536 F. Supp. 3d 839, 846 (D. Colo. 2021)

The Supreme Court has indicated that the standard for evaluating materiality, while "demanding," can depend on different kinds of proof:

> In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

Escobar, 579 U.S. at 194–95 (emphasis added).

Defendant tells us that "[r]elator's [r]esponse fails to identify any course of conduct or government reaction suggesting that the alleged violations would have affected payment decisions." Reply 12(b)(6) at 19. However, relator alleges proof that the government regularly denies claims tainted by kickbacks and it actively pursues violators of the statute:

- "The centrality of the AKS to the claims payment decision is demonstrated by the fact that Congress has determined that any Medicare claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g)." Compl. ¶ 105.
- Entities submitting claims to Medicare are subject to mandatory exclusion from Medicare by HHS-OIG if criminally convicted of an AKS violation, see, e.g., 42 U.S.C. § 1320a-7(a)(l), and subject to permissive exclusion if HHS-OIG determines that the provider "has committed an act" described in the AKS, 42 U.S.C. $ 1320a-7(b)(7)." Id. ¶106.
- "DHA likewise has authority to suspend providers for fraud and abuse, including the payment of kickbacks. 32 C.F.R. § 199.9(b), (f)." Id. ¶107.
- "The United States regularly enforces the AKS and pursues FCA liability based on the waiver of patient copayments. See, e.g., United States ex rel. Medrano v. Diabetic Care Rx, LLC, No. 15-cv-62617 (S.D. Fla.); United States ex rel. Strunck v. Mallinckrodt ARD LLC, No. 12-cv-0175 (E.D. Pa.)." Id. ¶109.

Further, relator alleges that the government's willingness to pay changed when it was informed of this particular scheme. He alleged that defendants lost their ability to fill prescriptions for Medicaid patients in Virginia, and at least one of their principal pharmacists had their license revoked because of the kickback scheme. Compl. ¶15.

Taking the allegations as true, relator has plausibly alleged that the defendants' omission of the free medication in its submissions to the government were material to the government's decision to pay.

### 4.    Payment

Fourth, relator must plead with particularity that the government actually paid for the allegedly false claim. Under the pleading standard of FRCP 9(b), "an FCA plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity making the misrepresentation and what he obtained thereby." (emphasis added).

Here, relator adequately alleges that payment was made. See, e.g. Compl. ¶¶ 66, 71, 76-88 (e.g., "Defendant received $1,328.02 in reimbursement from [Tricare] for the second

prescription"); 147 ("The Commonwealth….participated in payments made for claims that otherwise would not have been paid"). Relator further alleges that the percent gross profit change outpaced Kare pharmacy's increasing prescriptions between 2017 and 2019, which specifically indicates, if nothing else, that payment was being made. Compl. ¶¶ 5, 67-68. Defendants do not dispute that the government reimbursed for the second prescriptions.

### 5.    Presentment

Last, to survive a motion to dismiss, relator must also adequately allege presentment. Again, relator brings two types of FCA claims: "presentment claims" under 31 U.S.C. § 3729(a)(1)(A) (Counts One and Two) and "false-record-or-false-statement claims" under § 3729(a)(1)(B) (Counts Three and Four).

"Roughly speaking, a presentment claim alleges that a defendant knowingly submitted a false claim to the government themselves. A false-record-or-statement claim alleges that a defendant knowingly made a false statement or produced a false record material to a false claim that was submitted to the government by someone else." Nicholson, 42 F.4th at 193.

Importantly, "[b]ecause all False Claims Act claims must be linked in some way to presenting a claim for payment to the government[,] … [the] particularity requirement applies to that presentment element" as well. Nicholson, 42 F.4th at 194 (citing U.S. ex rel. Grant v. United Airlines Inc., 912 F.3d 190, 197 (4th Cir. 2018)). "Therefore, a central question in all FCA cases is whether the defendant ever presented a false or fraudulent claim to the government, resulting in a 'call upon the government fisc.'" Grant, 912 F.3d at 196 (quoting Harrison, 176 F.3d at 785-86).

"There are two ways to show presentment with particularity: either by alleging a representative example describing 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby'; or by alleging a 'pattern of conduct that would necessarily have led to submission of false claims.'" Nicholson, 42 F.4th at 194 (citation omitted). "If a relator seeks to allege presentment under the second avenue, Rule 9(b)'s particularity requirement requires 'that plaintiffs connect the dots, even if unsupported by precise documentation, between the alleged false claims and government payment.'" U.S. ex rel. Fitzer v. Allergan, Inc., No. 1:17-CV-00668-SAG, 2022 WL 3599139, at *6 (D. Md. Aug. 23, 2022) (quoting Grant, 912 F.3d at 199). "When the claim hinges on an underlying kickback violation, the kickback scheme must be pleaded with particularity as well." Nicholson, 42 F.4th at 194-195 (citing Nathan, 707 F.3d at 458).

Here, relator has alleged a representative sample, alleging that defendants submitted claims to insurance for medications that were either medically unnecessary or were related to illegal kickbacks. Compl. ¶¶ 73-90. He also makes allegations about a broader, general scheme to charge for medication that was either unnecessary or the product of a kickback scheme. Compl. ¶¶ 61-72.

In both situations, relator alleges that defendants submitted claims to the government for highly-reimbursed medications. The parties do not dispute that those claims were made to the government – they only dispute whether those claims were false or tainted with illegal kickbacks. For the reasons explained infra, relator plausibly and particularly alleges that those claims were untrue. Relator has sufficiently pled presentment.

42

### 6.    VFATA

"The VFATA is practically identical" to the FCA. <u>United States ex rel. Donohue v.</u> <u>Carranza</u>, No. 1:22-cv-189, 2022 WL 3226191, at *8 n.6 (E.D. Va. July 1, 2022); <u>see also</u> 12(b)(6) Mot. at 30-31 (arguing that "[r]elator's state law claim should also be dismissed as deficiently pled under Rules 9(b) and 12(b)(6) for the same reasons as his above-described claims under federal law."); Opp. 12(b)(6) at 27 (arguing that "[b]ecause Breslow has adequately pleaded FCA claims, Breslow has adequately pleaded VFATA claims."). In particular, "courts look to decisions interpreting the FCA in considering actions brought under the VFATA." <u>Phipps v. Agape Counseling and Therapeutic Servs., Inc.</u>, No. 3:13-cv-166, 2015 WL 2452448, at *4 (E.D. Va. May 21, 2015). Accordingly, when dismissing an FCA claim, a court should dismiss any corresponding VFATA claim in tandem. <u>United States ex rel. Rector</u> <u>v. Bon Secours Richmond Health Corp.</u>, No. 3:11-cv-038, 2014 WL 1493568, at *14 (E.D. Va. Apr. 14, 2014). On the other hand, when a court does not dismiss an FCA claim, it should not dismiss the corresponding VFATA claim. Here, because the FCA claim survives, so does relator's VFATA claim.

## IV.    <u>Rule 12(b)(1) Motion</u>

Separately, defendants have moved to dismiss relator's Amended Complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. 12(b)(1) Mot. They make two constitutional claims. First, they argue that the qui tam provision of the FCA violates Article II of the Constitution. <u>Id.</u> at 2-9. Second, they argue that relator lacks standing under Article III of the Constitution because he did not suffer a particularized harm. <u>Id.</u> at 9-12. The court finds neither of these arguments persuasive.

First, a bit on the qui tam provision and the current state of the law. The False Claims Act and its qui tam provision were enacted in 1863 "with the principal goal of 'stopping the massive frauds perpetrated by large … contractors during the Civil War." Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 781 (2000). Qui tam actions have existed since the end of the thirteenth century in England and have been a feature of American law since before the revolution. Id. at 774-777 (examining this history to find that qui tam actions are "cases and controversies" under Article III). While parties across the nation have continued to raise constitutional qualms with qui tam standing, courts have consistently rejected those arguments. See CLAIRE M. SYLVIA, THE FALSE CLAIMS ACT: FRAUD AGAINST THE GOVERNMENT, § 3:1 n.3 (citing U.S. ex rel. Zissler v. Regents of University of Minnesota, 154 F.3d 870 (8th Cir. 1998) (holding the Eleventh Amendment does not bar an FCA suit against a state); U.S. ex rel. Rodgers v. State of Ark., 154 F.3d 865 (8th Cir. 1998) (same); U.S. ex rel. Schumer v. Hughes Aircraft Co., 63 F.3d 1512, 1520 (9th Cir. 1995) (rejecting arguments that qui tam provisions are unconstitutional because of the Article III standing requirement, separation of powers, or the Appointment Clause), judgment vacated on other grounds, 520 U.S. 939 (1997); U.S. ex rel. Taxpayers Against Fraud v. General Elec. Co., 41 F.3d 1032 (6th Cir. 1994) (federal qui tam laws do not violate separation of powers or the Appointments Clause of the Constitution); U.S. ex rel. Mosay v. Buffalo Bros. Management, Inc., 20 F.3d 739, 741–42 (7th Cir. 1994) (holding that standing via the qui tam provision of 25 U.S.C. § 81 is compliant with Article III of the Constitution); U.S. ex rel. Kelly v. Boeing Co., 9 F.3d 743, 747–48 (9th Cir. 1993) (holding that the FCA qui tam provisions do not violate Article III standing requirements, separation of powers, the Appointments Clause, or the Due Process

Clause of the Fifth Amendment); U.S. ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148 (2d Cir. 1993) (holding that the FCA qui tam provision does not violate Article III); U.S. ex rel. Milam v. University of Texas M.D. Anderson Cancer Center, 961 F.2d 46, 49 (4th Cir. 1992) (holding that the United States is a real party in interest in a False Claims Act qui tam case, thus a state university is not entitled to Eleventh Amendment immunity from federal suit even where the United States declined active intervention); U.S. ex rel. Downy v. Corning, Inc., 118 F. Supp. 2d 1160 (D.N.M. 2000) (holding that the qui tam provision of the FCA did not unconstitutionally encroach on the executive branch's powers under the Take Care Clause because the executive branch may still terminate the lawsuit over relator's objections, with a hearing); U.S. ex rel. Robinson v. Northrop Corp., 824 F. Supp. 830 (N.D. Ill. 1993) (upholding qui tam constitutionality under Article III, holding that qui tam relators are not "Officers of the United States" under the Appointments Clause, qui tam provisions do not violate the separation of powers or due process); U.S. ex rel. Burch v. Piqua Engineering, Inc., 803 F. Supp. 115 (S.D. Ohio 1992) (holding that qui tam plaintiffs possess standing under Article III, Lujan notwithstanding, in part "because of the potential ramifications to their employment relationship by bringing the qui tam action"); U.S. Dept. of Housing and Urban Development ex rel. Givler v. Smith, 775 F. Supp. 172 (E.D. Pa. 1991) (holding that the FCA qui tam provisions did not violation the Appointments Clause, separation of powers, or Article III standing); U.S. ex rel. Truong v. Northrop Corp., 728 F. Supp. 615 (C.D. Cal. 1989) (holding that the FCA qui tam provisions do not violate Article III, separation of powers or the Appointments Clause); U.S. ex rel. Stillwell v. Hughes Helicopters, Inc., 714 F. Supp. 1084 (C.D. Cal. 1989) (holding that the 1986 amendments to

the FCA qui tam provision did not violate separation of powers, the Appointments Clause, or

Article III standing), et al.).

The only case to hold the FCA's qui tam provision unconstitutional is <u>United States ex</u>

<u>rel. Zafirov v. Fla. Med. Assocs., LLC</u>, 751 F. Supp. 3d 1293, 1318 (M.D. Fla. 2024)). At this

time, <u>Zafirov</u> stands alone for this proposition.[7]

### A.     Article II

As to Article II, defendants argue that there are "fundamental Article II problems with

the FCA's qui tam provision." 12(b)(1) Mot at 3. As they see it, Congress's delegation of the

ability to litigate on behalf of the government in qui tam cases "violates the Appointments

Clause, the Vesting and Take Care Clauses, and bedrock separation-of-powers principles" in

direct conflict with the Constitution. <u>Id</u>. (citing <u>Zafirov</u>). As described above, this point of

view disagrees with the vast majority of law on this issue. <u>See also</u> <u>United States v. Chattanooga</u>

<u>Hamilton Cnty. Hosp. Auth.</u>, No. 1:21-CV-84, 2024 WL 4784372, at *2–3 (E.D. Tenn. Nov.

7, 2024) (disagreeing with <u>Zafirov</u>). Nonetheless, the court will examine each of these

arguments in turn.

---

[7] Defendants cite to concurrences from the Supreme Court and the Fifth Circuit, arguing that they indicate the Court's desire consider Article II arguments about the FCA's qui tam provision. <u>Id</u>. at 2. In <u>United States ex</u> <u>rel. Polansky v. Executive Health Resources, Inc.</u>, 599 U.S. 419, 442 (2023), Justices Thomas, Kavanaugh and Barrett noted in their dissent (Justice Thomas) and concurrence (Justices Kavanaugh and Barrett) their skepticism about whether qui tam is consistent with Article II and whether private relators may represent the United States in litigation. Justice Kavanaugh wrote that "[i]n my view, the Court should consider the competing arguments on the Article II issue in an appropriate case." In <u>Wisconsin Bell, Inc. v. United States ex rel. Heath</u>, 604 U.S. 140 (2025), Justices Kavanaugh and Thomas repeated this sentiment in their concurrence. And in the Fifth Circuit, Judge Duncan's concurrence outlines that same skepticism while noting that Fifth Circuit precedent has upheld the FCA's constitutionality. <u>United States ex rel Montcrief v. Peripheral Vascular Assocs.,</u> <u>P.A.</u>, 133 F.4th 395, 410 (5th Cir. 2025) (Duncan, J., concurring). While these concurrences are informative, they are neither binding on this court nor do they specifically address the defendant's arguments in the context of the case before this court.

1.    **Appointments Clause**

In their Appointments Clause argument, defendants point out that Article II of the Constitution grants the President the power of the executive, who must "take Care that the Laws be faithfully executed." Id. at 3 (citing, inter alia, U.S. Const. art. II, §§ 1 & 3). Part of this executive power is the duty/power to appoint Officers of the United States with the advice and consent of the Senate as well as inferior officers. Id. at 3-4 (citing U.S. Const. art. II. § 2; United States v. Nixon, 418 U.S. 683, 693 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case" on behalf of the United States). The FCA's qui tam provision impermissibly grants to relators the powers of an Officer of the United States, they argue, in contravention of the Constitution's separation of powers. Id. at 4-6. Defendants argue that, like Officers of the United States, relators may litigate "in the name of the Government", wielding significant federal authority, and they occupy a continuing position with regards to their specific case. Id. This makes them unappointed Officers of the United States, defendants allege, which is unconstitutional because only the President may appoint his or her officers. Id. (citing the Appointments Clause, U.S. Const. art. II, § 2, cl. 2). In making this argument defendants cite heavily to the recent decision in Zafirov, which is non-binding on this court and currently on appeal. See Zafirov v. Florida Medical Associates, LLC, et al, No. 24-13583 (11th Cir.)(October 30, 2024).

Key to this argument is the contention that an FCA relator is effectively an "Officer of the United States" within the meaning of the Appointments Clause, U.S. Const. art. II. § 2. The problem with this argument is that relators are not Officers of the United States.

"Officer of the United States" is a term "intended to have substantive meaning" – an Officer "must be appointed in the manner prescribed" by the Appointments Clause. Buckley v. Valeo, 424 U.S. 1 (1976).  Within the meaning of the Appointments Clause, the role of an Officer of the United States has a role that is that is "continuing and permanent," rather than "occasional or temporary." See Lucia v. Sec. & Exch. Comm'n, 585 U.S. 237, 245 (2018) (citing United States v. Germaine, 99 U.S. 508, 511-512 (1879)). "[A]n individual must occupy a "continuing" position established by law to qualify as an officer." Id.  An Officer of the United States also "exercise[es] significant authority pursuant to the laws of the United States." Buckley, 424 U.S. at 126.

The court finds that an FCA relator is neither (1) appointed by the Executive; nor (2) occupying a "continuing and permanent" role, nor (3) exercising "significant power." Relator is not an Officer of the United States, and his role in this case does not violate Article II of the Constitution.

On (1), everyone agrees. 12(b)(1) Mot. at 12; ECF No. 99 at 5; ECF No. 110 at 3. "A private relator is neither appointed as an officer of the United States nor employed by the United States." Cochise Consultancy, Inc. v. United States ex rel. Hunt, 587 U.S. 262, 263 (2019). And, as defendants point out, a private relator cannot be removed by the government – another hallmark (albeit non-dispositive) trait of an Officer of the United States. 12(b)(1) Mot. at 8 (see Seila L. LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197, 228 (2020) ("the President's removal power is the rule, not the exception" for Officers of the United States)).

On (2), the relator's allegedly "continuing and permanent role," defendants emphasize that the role of relator extends for the length of litigation. Citing Zafirov, defendants argue

48

that the relator is "akin to a special prosecutor or a bank receiver, in that the each hold a 'continuing position' with respect to a single matter." 12(b)(1) Mot. at 6 (also citing <u>Morrison v. Olson</u>, 487 U.S. 654, 660-63 (1988) (independent counsel was an Officer of the United States); <u>United States v. Weitzel</u>, 246 U.S. 533, 541(1918) (recognizing that a receiver was an Officer of the United States)).

There is a difference between having a "continuing position" and being a qui tam relator. A continuing position is an office specific to that role; a qui tam relator is specific to an individual person. As the government points out, the continuing role of a special prosecutor or a receiver, while particular to a specific case, is not specific to the *person* who is appointed to perform them. ECF No. 110 at 4-5. Unlike a "continuing position," the *role* of relator cannot be transferred to another, even if another would have qualified as a relator before the case was filed. If a special prosecutor or a receiver is unable to perform their duties, a new special prosecutor or receiver is appointed in their stead. But if a relator no longer continues their role, the litigation is dropped unless the government intervenes. 31 U.S.C. § 3730(b)(5). And if a relator dies, their estate continues the case – this is not another person stepping into the role, but a continuation of the same legal person and claim. The fact that a relator's case as a "private person" under 31 U.S.C. § 3730(b) is specific to the *person*, not the *position*, is made exceedingly clear by the False Claims Act's "first to file" rule codified in 31 U.S.C. § 3730(b)(5)("When a person brings an action under this subsection no person other than the Government [not even another relator] may intervene or bring a related action based on the facts underlying the pending action").

For (3), "significant powers," defendants emphasize the powers of an FCA relator. In their estimation, an FCA relator has the "power and authority to initiate, direct, and control the enforcement of public law through litigation 'in the name of the Government'," allegedly "without direct accountability to anyone in the Executive Branch." 12(b)(1) Mot. at 5 (quoting Zafirov at *2). Also quoting Zafirov, defendants argue that the FCA permits relators to "bind[] the federal government (sometimes even in future cases) and recover[] punitive damages that flow to the public treasury….[and] decid[e] how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." Id. at 5-6.

A review of 31 U.S.C. § 3730 reveals many provisions protecting executive authority over a qui tam suit:

- The Attorney General may bring an FCA civil action against a violator of the False Claims Act, no relator required. 31 U.S.C. § 3730(a).
- A qui tam action may be dismissed only if the Attorney General gives written consent to the dismissal, with their reasons for consenting. 31 U.S.C. § 3730(b)(1).
- The government must be served with a copy of the complaint, and disclosure of all evidence and information a potential relator possess – and they have the right to intervene and proceed with the action within 60 days. 31 U.S.C. § 3730(b)(2), b(3), b(4). They may also move to extend that 60-day deadline with good cause. 31 U.S.C. § 3730(b)(3).
- Only the government may intervene in the qui tam action or bring a related claim based on the same underlying facts. 31 U.S.C. § 3730(b)(5).
- Even if the relator brings the suit, the government may proceed with the action with the "primary responsibility for prosecuting the action," and "shall not be bound by an act of the person bringing the action." 31 U.S.C. § 3730(c).
- The government may dismiss the action over the relator's objection. 31 U.S.C. § 3730(c)(2)(A), see also Polansky v. Executive Health Resources, Inc., 599 U.S. 419, 430 (2023).
- The government may settle the action over the relator's objection. 31 U.S.C. § 3730(c)(2)(B).
- Where the government shows that a relator's unrestricted participation in the case interferes with or unduly delays the government's prosecution, a court may impose limitations on the relator's participation. 31 U.S.C. § 3730(c)(2)(C)-(D).

- When the government elects not to proceed with the action, only then does a relator have the right to conduct the action. Even then, the government may later intervene with good cause. 31 U.S.C. § 3730(c)(3).
- The government may request a stay discovery in a qui tam suit if it believes it would interfere with its investigation or prosecution of a matter arising out of the same facts, civil or criminal. 31 U.S.C. § 3730(c)(4).
- The government may elect to pursue the claim "through any alternate remedy available to the government[.]" The findings of fact and conclusions of law in that proceeding are binding on the relator's qui tam case. 31 U.S.C. § 3730(c)(5).
- And a relator's claim is precluded by any other preceding civil suit or administrative civil money proceeding in which the government is already a party. 31 U.S.C. § 3730(c)(5).

The government clearly retains the first (and sometimes, second or third) bites at controlling an FCA civil case brought by a relator. Accord Riley v. St. Luke's Episcopal Hosp., 252 F.3d 749, 753 (5th Cir. 2001) ("the Executive retains significant control over litigation pursued under the FCA by a qui tam relator"); Taxpayers Against Fraud, 41 F.3d at 1041 (the FCA qui tam provisions "have been crafted with particular care to maintain the primacy of the Executive Branch in prosecuting false-claims actions, even when the relator has initiated the process"). The court is unconvinced that, under this statute, the relator somehow attains "significant authority" in the meaning of Buckley. 424 U.S. at 126.

Throughout this process, the relator continues to be a "private person." 31 U.S.C. § 3730(b). They are not vested with government power. And indeed, the government maintains significant power over the suit. See, e.g. Cochise, 587 U.S. at 272 ("[a]lthough that provision explains that the action is brought 'for the person and for the United States Government' and 'in the name of the Government,' … it does not make the relator anything other than a private person, much less "the official of the United States" referenced by the [FCA]"). A relator is

not an Officer of the United States, and their role as relator does not violate Article II of the Constitution.

For the above-stated reasons, the court finds defendants' argument that the qui tam provision of the FCA violates the Appointments Clause unconvincing.

## 2.    Vesting and Take Care Clauses

In their Vesting Clause and Take Care Clause arguments, defendants point out that the President is vested with the executive power and the duty to take care that the laws are fully executed – both personally and through his or her appointed officers. 12(b)(1) Mot. at 7 (citing U.S. Const. art. II, § 1, cl. 1; Id. § 3). Thus, they argue "[t]he FCA's qui tam provision violates the Vesting and Take Care Clauses by impermissibly vesting core executive power in private relators while denying the Executive removal authority and sufficient oversight and supervisory control over the relator and the litigation." Id.

This argument, too, pales in light of the significant power the government maintains over a qui tam case. See infra; see also 31 U.S.C. § 3730(a)-(c). The core executive power remains with the Executive.

Defendants point out that the qui tam provision permits a private person to initiate a qui tam suit without government approval, "thus blunting and usurping one of the key powers and controls of the Executive to exercise discretion in enforcing the laws." 12(b)(1) Mot at 8. They argue that where the government has declined to enforce an FCA civil claim, "the government has no control over which allegations, claims, or legal theories a relator chooses to advance." Id. While that's true, it ignores the fact that the government in that situation *chose* not to intervene, and this does not undermine the control the government has over qui tam

cases. In any event, the government can change its mind and intervene with good cause. 31 U.S.C. § 3730(c)(3).

Because the FCA permits significant executive control over FCA claims (should the executive decide to exert that control) it seems that the defendant's Vesting Clause and Take Care Clause qualms with qui tam suits are specific to (a) the ability of an FCA relator to initiate a qui tam suit and (b) the inability of the government to remove a relator once a case is filed under 31 U.S.C. § 3730(b). 12(b)(1) Mot. at 8. But there are plenty ways that Congress has permitted private parties – not just the government – to file suit to enforce federal statutes without violating Article II. See ECF No. 110 at 8; see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 578 (1992) ("[t]he ... injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.') (quoting Warth v. Seldin, 422 U.S. 490, 500 (1975)). As the government points out, it is not a delegation of executive power to permit individuals to sue over violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f), or the antitrust laws, 15 U.S.C. § 15. The executive is not empowered to prevent private citizens from initiating those suits or remove the plaintiff from a suit seeking to enforce a federal law for a private injury, and this does not violate the Take Care Clause. See, e.g. Riley., 252 F.3d at 753 ("Although the Clause states that the Executive must 'take Care that the Laws be faithfully executed,' it does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law.") (quoting U.S. Const. art. II, § 3).

To be sure, the key difference between those private suits to enforce the Civil Rights Act, for example, and a qui tam action like the present case is that a Civil Rights Act suit is

typically not made in the government's name or on the government's behalf the way a qui tam

action is. 31 U.S.C. § 3730(b)(1). But the long history of qui tam suits – dating back to the time

of the founders – indicates that they were obviously compatible with the founders' notions of

executive power. See ECF No. 110 at 10-12; see also Stevens, 529 U.S. at 776–777 ("a

considerable number of informer statutes" were passed by the first Congress), 777 n.6-7

(listing examples of informer statutes); Marsh v. Chambers, 463 U.S. 783, 790 (1983)

(legislation passed by the first Congress "is contemporaneous and weighty evidence of its true

meaning").

The court holds that the FCA qui tam provision does not violate the Vesting or Take

Care Clauses.

### B.    Article III

As to Article III, defendants argue that private qui tam actions violate the standing

requirements of Article III. To have standing, a plaintiff in an Article III court must have

suffered an injury in fact, that injury must be causally connect to the conduct complained of,

and the injury must be redressable by the courts. See, e.g. Lujan, 504 U.S. at 560-561

(explaining the three elements of standing).

Defendants argue that relator has no standing in the case because he has suffered no

concrete, particularized, or palpable injury. 12(b)(1) Mot. at 9-10 (citing Gladstone Relators v.

Village of Bellwood, 441 U.S. 91, 100 (1979) ("In no event…may Congress abrogate the Art.

III minima: A plaintiff must always have suffered 'a distinct and palpable injury to himself,'

that is likely to be redressed if the requested relief is granted"); TransUnion LLC v. Ramirez,

594 U.S. 413, 428 ("no concrete harm, no standing")).

Defendants highlight that in this claim, as with all other FCA qui tam claims, the government is the 'real party in interest' to the action. 12(b)(1) Mot. at 10-11 (citing United States ex rel. Polansky v. Executive Health Resources, Inc., 599 U.S. 419, 425 (2023)). Relator may not assert a generalized claim as a taxpayer (Id. at 11, citing Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 482 (1982)) nor may he assert that the bounty provision of the FCA grants him standing (Id., citing Stevens, 529 U.S. at 772 (2000)). And Congress, they argue, "cannot remove the minimum Article III concrete harm requirements by assignment." Id. (citing Lujan, 504 U.S. at 577 (reasoning that the Article III "concrete injury requirement has separation-of-powers significance").[8]

The Supreme Court has spoken clearly on this issue: "a private individual has [Article III] standing to bring suit on behalf of the United States under the False Claims Act[.]"[9] Stevens, 529 U.S. at 787.  In Stevens, Justice Scalia reasoned that "the United States' injury in fact suffices to confer standing on [an FCA relator]" by virtue of "the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." Id. at 773-774. The FCA "can reasonably be regarded as effecting a partial assignment of the Government's damages claim." Id. at 773. The "long tradition of qui tam actions in England and the American Colonies" establishes qui tam actions as the kind of "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." Id. (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998)). This history, paired with the explicit

---

[8] Defendants imply that in Lujan, the Supreme Court ruled on the "FCA's impermissible transfer of power from the Executive to Congress." 12(b)(1) Mot. at 12. Lujan did not consider the FCA.
[9] Stevens did not address Article II constitutionality of qui tam actions. Stevens, 529 U.S. 765, 778 n.8.

assignment by Congress in the False Claims Act, "leaves no room for doubt that a qui tam relator under the FCA has Article III standing." Id. at 778.

Defendants ask this court to ignore Stevens and upset settled law. The court declines to do so. Relator has standing to bring this suit.

## V.    Conclusion

For the reasons stated herein, the renewed motion to dismiss under Fed. R. Civ. P. 12(b)(6) and 9(b) filed by defendants, ECF No. 97, is **DENIED** and the motion to dismiss under Fed. R. Civ. P. 12(b)(1) filed by defendants, ECF No. 96, is **DENIED**.


Entered:    December 15, 2025

Mike Urbanski
Senior U.S. District Judge
2025.12.15 14:00:06
-05'00'

Michael F. Urbanski
Senior United States District Judge